UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

AMBER WRIGHT,

        Plaintiff,

v.

STATE OF WASHINGTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES; and BRUCE MORRISON, individually and in his official capacity acting under color of State law,

        Defendants.

Case No. C09-5126RJB

ORDER ON DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT RE: 42 U.S.C. § 1983 CLAIMS

This matter comes before the Court on the Defendants' Motion for Partial Summary Judgment Re: 42 U.S.C. § 1983 Claims. Dkt. 102. The Court has reviewed the pleadings filed regarding the motion and the record herein.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    BASIC FACTS

Plaintiff Amber Wright and a younger sibling were removed from the custody of their father when the Sumner Police Department arrested David Wright on August 18, 2004. Dkt. 105, at 2. Ms. Wright's parents were divorced (Dkt. 104, at 7), she was living with her father at the time, and her mother was using methamphetamine (Dkt. 104, at 11). Ms. Wright's paternal grandmother, Ellen Buckner, picked the children up at the police station late in the evening on August 18, 2004. Dkt. 104, at 28. That same day, (August 18, 2004), Washington's Department of Social and Health Services, Child Protective Service

ORDER
Page - 1

1   ("CPS"), received a referral from the Sumner, Washington Police Department that David Wright may be
2   giving Ms. Wright drugs and sexually molesting her. Dkt. 105, at 7-8. The referral states:

> Referring officer has been interviewing several 14 and 15 year old girls from the Sumner
> area who report that Mr. Wright has been approaching them asking for sexual contact. . . .
> During police investigation the victims/witnesses told police that they have observed Mr.
> Wright asking his own daughter Amber (age 13) to take her shirt off and to dance nude.
> Also they have observed Mr. Wright giving Amber methamphetamines.

6   Dkt. 105, at 8. The referral was given a "moderately high" 'risk tag," and the "investigation standard"
7   was marked "high." Dkt. 105, at 7.

8      Ms. Buckner, the children's grandmother, lived in Olympia, Washington at the time she took
9   custody of the children. Dkt. 104, at 28.

10     CPS Social Worker and Defendant here, Bruce Morrison, was assigned to the case on August 19,
11  2004. Dkt. 105, at 2. He worked on the case from August 19, 2004, until October 23, 2004. Dkt. 105, at
12  2. He contacted Ms. Buckner, who he knew was the mother of the alleged perpetrator, on August 19,
13  2010, regarding the case. Dkt. 104, at 30. Ms. Buckner testified that Mr. Morrison came to her home and
14  interviewed her and the children together. Dkt. 104, at 32. Ms. Buckner testified that they discussed
15  getting Ms. Wright an examination and getting a safety assessment/plan in place for the children. Dkt.
16  104, at 32. Ms. Buckner signed the safety assessment/plan, but David Wright did not. Dkt. 121- 7, at 49.
17  Defendant Morrison testified that he asked the children about whether they felt safe where they were, if
18  they were afraid, and whether they were comfortable. Dkt. 104, at 53. Ms. Buckner agreed to take Ms.
19  Wright to Mary Bridge Children's Hospital for a sexual assault assessment which was set up by
20  Defendant Morrison. Dkt. 104, at 37.

21     Ms. Wright states that Mr. Morrison did not ask her if she felt safe living with Ms. Buckner.
22  Wright Decl. At 2. She states that Mr. Morrison did not ask her privately about what Mr. Wright had
23  done to her. *Id.* Ms. Wright states that Ms. Buckner pressured her to not reveal what Mr. Wright had
24  done. *Id.* She states that Ms. Buckner was always present, and Ms. Wright was afraid to tell the truth.
25  *Id.*   On August 20,2004, Ms. Wright participated in the sexual assault interview and forensic
26  examination with Yolanda Duralde, M.D., at Mary Bridge Children's Hospital. Dkt. 103, at 1. Dr.
27  Duralde states that physical examination looked "normal (non-specific)." Dkt. 103, at 2. She states that
28  only herself, Ms. Wright and Velma Byers, R.N. were present during the examination. Dkt. 103, at 2. Dr.

Duralde states that the physical examination did not "rule out sexual abuse but Ms. Wright denied any sexual contact with her father." Dkt. 103, at 2. Dr. Duralde relates that "Ms. Wright advised her father had not given her drugs," and that "she had been sexually active last year with a boy her own age." Dkt. 103, at 2. Dr. Duralde opined that Ms. Wright's "grandmother seems to be a very concerned and supportive care giver. She seemed interested in maintaining the patient's safety." Dkt. 103, at 8. Dr. Duralde's overall assessment was "possible sexual abuse." Dkt. 103, at 8. She noted that "[o]ther parties have disclosed that Amber's father has propositioned her and given her drugs. It is unclear at this time if these other parties are a reliable source of information." Dkt. 103, at 8. She recommended that Plaintiff not have unsupervised contact with her father until "this situation is fully investigated." Dkt. 103, at 8.

After Ms. Wright's physical examination and sexual assault interview, Ms. Wright, Dr. Duralde, Ms. Buckner, and Mr. Morrison had a "wrap up" discussion about Ms. Wright's care. Dkts. 103, at 8 and 104, at 39. Defendant Morrison relates that at that time he learned that Ms. Buckner had taken Ms. Wright to Sumner the day before. Dkt. 104, at 55. Ms. Buckner states that they went to retrieve the children's clothing. Dkt. Dkt. 104, at 29. Mr. Morrison states that they told him they went to try and find some of Plaintiff's friends to attest to her father's innocence. Dkt. 104, at 55. Mr. Morrison states that it was his impression that going to find her friends was Ms. Wright's idea. Dkt. 121-3, at 16-17. Mr. Morrison states that he told them that they should not interfere in the police investigation. Dkt. 121-3, at 16-17.

Ms. Buckner testified that David Wright gave her temporary guardianship of the children on August 21, 2004, in writing. Dkt. 104, at 36.

Ms. Buckner testified that Mr. Morrison visited her house at least three times, including the initial visit in August of 2004, and called often. Dkt. 104, at 42. Mr. Morrison testified that he also remembered making visits to Ms. Buckner's home as well, but did not record any of those visits in a Service Episode Record. Dkt. 104, at 58. Mr. Morrison testified that he was aware that he was supposed to create Service Episode Record any time anything of significance occurred in a case. Dkt. 121-3, at 5-7. Ms. Buckner also testified that she called Mr. Morrison if she had questions about the children's medical care, for example. Dkt. 104, at 43. Ms. Wright contends that Mr. Morrison did nothing to check on her. Dkt. 117, at 2.

Mr. Morrison testified that he did not institute dependency proceedings, but treated this case like a "dependency type of case." Dkt. 104, at 75. He testified that the Sumner Police Department made the decision to place the children with Ms. Buckner. Dkt. 104, at 77. Mr. Morrison did not conduct a "home study" on Ms. Buckner. Dkt. 121-3, at 9.

On August 25, 2004, Mr. Morrison states that Mr. Wright called him, told him that he was out of jail, and wanted to see the children. Dkts. 104, at 60-63 and 105, at 3. Mr. Morrison testified that he then spoke with the investigating police officer about the case. Dkt. 104, at 59-60. Mr. Morrison testified that he asked the investigative police officer "if the investigation was concluded, if they had found anything, if they were going to press charges, that type of information. He informed me that they had not and that he had sent everything to the prosecuting attorney's office." Dkt. 104, at 60. Mr. Morrison testified that the police officer told him that "there was nothing that they could criminally charge him with." Dkt. 104, at 62. Mr. Morrison acknowledges that there is not a Service Episode Record for this conversation. Dkt. 104, at 59. Mr. Morrison states that he contacted the prosecuting attorney's office "to find out if there were any restrictions on Mr. Wright having contact with his child and they told me that there were no restrictions . . . other than [the visits were] to be supervised." Dkt. 104, at 60. Mr. Morrison stated that he told Mr. Wright at that time he could only have supervised visits. Dkt. 105, at 3.

Ms. Wright states that her grandmother made her go with her to pick her father up from jail Dkt. 117, at 2. She states that they then both pressured her "to deny what was happening inside [Mr. Wright's] house." *Id.*

Mr. Morrison acknowledges that he did not obtain the witness statements or interview any of the other minor children who alleged in the police reports that they were given drugs by David Wright, alleged that they were being asked to perform sexual favors for him, or asserted that he was sexually molesting and giving drugs to Ms. Wright. Dkt. 104, at 66.

Mr. Morrison states that on October 20, 2004, David Wright contacted him and asked if he could have his children back. Dkt. 105, at 3. Mr. Morrison states that Mr. Wright told him that he was no longer drinking. Dkt. 105, at 3. Mr. Morrison states that he told Mr. Wright that "no charges were filed against him so [Mr. Morrison] had nothing to say about him getting his children back." Dkt. 105, at 3.

Ms. Buckner stated that she had a conversation with Mr. Morrison about whether she could keep the children until a break in the school year, and he told her that she could not stop Mr. Wright from taking the children. Dkt. 104, at 44. Ms. Buckner stated that she felt like the children were doing well in her care, but wanted to go home and live with their father. Dkt. 104, at 43-45. She testified that she told Mr. Wright she thought it would be an easier transition if the children left during a break, but that he did not wait for one. Dkt. 104, at 44.

Mr. Morrison testified that in October of 2004, he did not believe that Mr. Wright was harming, or going to harm the children. Dkt. 104, at 72. On October 23, 2004, he closed the CPS investigation. Dkt. 105, at 3. In his final report, entitled "Investigative Assessment," Mr. Morrison's findings were "unfounded" for sexual abuse, neglect and maltreatment. Dkt. 105, at 29-31. He states:

> When I investigated this referral Amber steadfastly refused to disclose that her father had ever asked her to Sexually Abuse her. David Wright was released from jail for lack of evidence. He followed the Safety Plan that we had in place to the letter. Based on the lace [sic] of evidence and Amber's failure to disclose the results of this investigation will be UNFOUNDED.

Dkt. 105, at 29. In his assessment of "overall risk," Mr. Morrison states:

> The children are currently residing with there [sic] Paternal Grandmother. She is very protective of the children. She does not want David to get the kids back until he has competed [sic] an Alcohol rehabilitation program. If she continues to care for the children there [sic] risk is minimal. If they go to there [sic] father and he then as [sic] to go in patient treatment it will cause a lot of turmoil in their lives. Amber is doing very well in school for the first time in several years.

Dkt. 105, at 30.

David Wright moved his children to Raymond (in Pacific County) Washington, where he sexually abused and beat Plaintiff. Dkt. 121-10, at 33-61. In 2005, Pacific County charged David Wright with several counts of child molestation, rape of a child, and incest. Dkt. 121-9, at 6-10. David Wright entered a plea agreement and served time in prison. Dkt. 121-9, at 13.

When asked the question: "[i]n 2004 do you believe you were qualified to investigate allegations of sexual abuse concerning a child?," Mr. Morrison testified: "No, sir, I do not." Dkt. 104, at 64.

**B.   PROCEDURAL FACTS**

Originally filed in Pierce County, Washington Superior Court on February 19, 2009, Plaintiff makes claims against the Defendants for negligence and for violation of her civil rights under 42 U.S.C. § 1983. Dkt. 1. Plaintiff makes reference to the equal protection clause, and substantive and procedural

due process clauses of the United States Constitution. *Id.* Plaintiff alleges that Defendants failed to properly investigate referrals and allegations of abuse and neglect concerning her father, David Wright. *Id.* Plaintiff alleges that Defendants violated their duties to act reasonably "when receiving information about the dangerous proclivities of Wright." *Id.* Plaintiff alleges that as a result, she was subjected to repeated abuse, including sexual abuse, by her father. *Id.* Plaintiff seeks monetary damages and attorneys' fees. *Id.*

On March 10, 2009, Defendants removed the case based on this Court's federal question jurisdiction pursuant to 28 U.S.C. § 1331. Dkt. 1.

Defendants now move for partial summary judgment, arguing that Defendant Morrison did not violate Plaintiff's substantive due process rights when he failed to separate her from her father. Dkts. 102 and 122 (*citing Deshaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189 (1989)). Defendants argue that neither the special relationship exception nor the danger creation exception apply. *Id.* Defendants argue that even if Defendant Morrison did violate her substantive due process rights, he is entitled to qualified immunity because those rights were not clearly established at the time. *Id.* Defendants argue that her procedural due process claim should be dismissed because Plaintiff has failed to identify a protected liberty interest deserving of the protection of due process. *Id.* Defendants argue that even if she could, Defendant Morrison is still entitled to qualified immunity as to the procedural due process claim. *Id.* Defendants argue that Plaintiff's equal protection claim should be dismissed because she has not shown that Defendants acted with an intent or purpose to discriminate against her because of her membership in a protected class. *Id.*

Plaintiff filed a Response, arguing that Defendant Morrison "created a danger, or rendered plaintiff more vulnerable to a danger" and so the state created danger exception to *Deshaney* applies. Dkt. 116. Plaintiff argues that Defendant Morrison created a "special relationship" between Plaintiff and the state when he kept "her out of her familial home and in the home of the perpetrator's mother" and so the "special relationship" exception to *Deshaney* applies. *Id.* Plaintiff argues that her constitutional rights were clearly established and so qualified immunity should be denied. *Id.*

1    Plaintiff has failed to meaningfully contest Defendants motion to dismiss her procedural due
2 process claim or equal protection claim.  Accordingly, Defendants' motion to dismiss the procedural due
3 process and equal protection claims should be granted.
4    Defendants also move to strike "any comment by Plaintiff's standard of care experts Katherine
5 Kent and Jane Ramon that Defendant Morrison's conduct was deliberately indifferent to the constitutional
6 rights of Plaintiff."  Dkt. 122.
7    This opinion will now address the core question of the pending summary judgment motion:
8 whether Defendant Morrison is entitled to qualified immunity on Plaintiff's substantive due process
9 claim.

## II.    DISCUSSION

### A.    MOTION TO STRIKE

Defendants' motion to strike comments by Plaintiff's standard of care experts Katherine Kent and Jane Ramon that Mr. Morrison was "deliberately indifferent" to Plaintiff's constitutional rights (Dkt. 122) should be granted.  Whether Mr. Morrison is "deliberately indifferent" is a legal conclusion to which neither expert may opine.

### B.    SUMMARY JUDGMENT - STANDARD

Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, admissions, and disclosure materials on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the non moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."); *See also* Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the

differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson, supra)*. Conclusory, non specific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

## C.  QUALIFIED IMMUNITY

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Through application of the qualified immunity doctrine, public servants avoid the general costs of subjecting officials to the costs of trial - distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service." *V-1 Oil Co. v. Smith*, 114 F.3d 854, 857 (9th Cir. 1997)(*internal citations omitted*). The immunity is "immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

The Supreme Court established a two-part analysis in *Saucier v. Katz*, 533 U.S. 194, 201 (2001), for determining whether qualified immunity is appropriate in a suit against a public official for an alleged violation of a constitutional right. *Boyd v. Benton County*, 374 F.3d 773, 778 (9th Cir. 2004), citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Although no longer mandatory, the Supreme Court has recently held that it may be "beneficial" for a court required to rule upon qualified immunity to examine the *Saucier* factors: (1) whether the official violated the plaintiff's constitutional rights on the facts alleged and (2) if there was a violation, whether the constitutional rights were clearly established.

*Pearson v. Callahan*, 129 S.Ct. 808, (2009) (holding that the *Saucier* two-part analysis was no longer mandatory). Application of the factors is beneficial here, so this opinion will first turn to whether Plaintiff's substantive due process rights were violated. This opinion will then turn to whether any of those rights were clearly established at the relevant time.

        1.     *Substantive Due Process Violation?*

It is well established that the Due Process clause of the Constitution protects a citizen's liberty interest in his own bodily security. *Kennedy v. City of Ridgefield,* 439 F.3d 1055, 1061 (9th Cir. 2006) (*citing Ingraham v. Wright,* 430 U.S. 651, 673-74 (1977); *Wood v. Ostrander,* 879 F.2d 583, 589 (9th Cir.1989)). Generally, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago County Dept. of Soc. Serv.,* 489 U.S. 189, 197 (1989). In *DeShaney*, a mother and her son, Joshua, sued county social workers alleging that they had deprived Joshua of his rights under the substantive due process clause when the social workers failed to intervene to protect him from his father. In that case, social workers received several complaints from neighbors and hospital employees that Joshua was being beaten by his father. *DeShaney*, at 192. At one point, Joshua was admitted to the hospital with multiple injuries. *Id.* The county decided the hospital would have temporary custody of Joshua, but three days later allowed him to return home to live with his father. *Id.* A month later, the hospital again called stating Joshua had been treated for injuries. *Id.* The social worker felt there was no basis for action. *Id.* The social worker observed the family for the next six months, during which she noted that the family was not following any of the recommendations set out by the county in order to help keep Joshua safe. *Id.*, at 193. The social worker did not act. *Id.* A few months later, Joshua's father beat him so badly that he was rendered profoundly retarded. *Id.* Finding that Joshua did not have a claim under the Due Process Clause, the U.S. Supreme Court stated:

> Nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.

*Id.* at 195. The Court noted that while the state was aware of the dangers Joshua faced, "it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *Id.,* at 201. There are two recognized exceptions to the general rule announced in *DeShaney*: the state created danger exception and special relationship exception. *Id.* Plaintiff asserts that both apply here.

        a.  *State Created Danger Exception*

  The state's failure to protect an individual against private violence can violate the guarantee of due process where state action affirmatively places the plaintiff in a position of danger. *Kennedy* at 1061 (*citing DeShaney* at 197). "That is, where state action creates or exposes an individual to a danger which he or she would not have otherwise faced." *Id.* The Ninth Circuit first considered the state created danger exception in *Wood v. Ostrander,* 879 F.2d 583 (9th Cir.1989), *cert. denied,* 498 U.S. 938, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990). In *Wood*, a police officer stopped a car, arrested the driver for drunk driving, impounded the car, and left the female passenger stranded alone in a high crime area. *Id.* The passenger was raped. *Id.* The Ninth Circuit found that a jury presented with the above could find that the police officer acted with deliberate indifference to Wood's interest in personal security under the fourteenth amendment. *Id.* The Ninth Circuit has subsequently found that plaintiffs alleged a triable danger creation claim in cases like *L.W. v. Grubbs,* 974 F.2d 119 (9th Cir.1992) (holding that state employees could be liable under the state created danger exception for the rape of a registered nurse assigned to work alone in the medical clinic of a medium security prison with a known, violent sex offender after being assured that she would never work alone) and *Penilla v. City of Huntington Park,* 115 F.3d 707 (9th Cir.1997) (*per curiam*)(state created danger exception claim viable where police officers who, after finding plaintiff in grave need of medical care on his front porch, cancelled a 911 call for paramedics, put him back in his home, and locked him inside). The Ninth Circuit found in *Munger v. City of Glasgow Police Dep't,* 227 F.3d 1082 (9th Cir. 2000) that police officers could be liable under the state created danger exception for the hypothermia death of a visibly drunk patron dressed in a t-shirt and jeans after officers ejected him from a bar on a bitterly cold night and told him not to drive anywhere. Similarly, in *Kennedy v. City of Ridgefield,* 439 F.3d 1055 (9th Cir. 2006) the Ninth Circuit held that a police officer acted with deliberate indifference to an affirmatively created known danger to plaintiff. In *Kennedy* the police officer informed a known violent neighbor of plaintiff's allegations of child

molestation without first warning plaintiff as the officer had promised to do. *Id.* The officer also promised to patrol plaintiff's neighborhood. *Id.* The Court held that the officer knew that telling the violent neighbor about the allegations against him without warning the plaintiff placed her in a danger she otherwise would not have faced. *Id.* at 1064. The neighbor shot the plaintiff and her husband that night. *Id.* In each of these cases the state took an affirmative action to place the plaintiff in danger or enhanced the danger.

These cases stand in contrast to *Johnson v. City of Seattle*, 474 F.3d 634 (9th Cir. 2007). In *Johnson*, plaintiffs who were assaulted by members of a riotous crowd at a Mardi Gras celebration were held not to have a § 1983 claim under the state created danger theory against the city, mayor, and police chief. *Id*. Plaintiffs argued that the city officials' decision to switch from a more aggressive operation plan for crowd control to a more passive one was not affirmative conduct that placed the plaintiffs in danger. *Id.*, at 641. The Ninth Circuit noted that plaintiffs voluntarily attended the event. *Id.* The Court held that the governmental actors did not create the dangerous conditions or expose plaintiffs to a situation in which was more dangerous than the one they found them. *Id.*

In the Ninth Circuit, there are two elements in deciding whether the state created danger exception applies: i) danger affirmatively created due to state action and ii) the state official's deliberate indifference to a known or obvious danger. *Id.*

      i.      <u>Danger Affirmatively Created Due to State Action</u>

In examining whether a governmental official affirmatively places an individual in danger, the Court does not look solely to the agency of the individual, nor rest the decision on what options may or may not have been available to the individual. *Kennedy*, at 1062. Instead, the question is whether the official left the person in a situation that was more dangerous than the one in which they found him. *Id.* Here then, the issue is whether any affirmative action by Defendant Morrison placed Ms. Wright in a situation that was more dangerous than the one in which he found her. The undersigned concludes that there was none.

Here, as in *DeShaney* and *Johnson*, there is no evidence that the state took an affirmative action which placed Ms. Wright in a situation that was more dangerous than the one in which they found her. Defendant Morrison did not require that Ms. Wright move in with her grandmother. When Mr. Wright

was arrested, the Sumner Police Department contacted Ms. Buckner, she picked the children up at the police station, and signed a "Juvenille Release Form." Dkt. 121-12. Mr. Morrison did not take Ms. Wright out of the custody of her grandmother and place her with her father. Plaintiff argues that Defendant Morrison affirmatively exposed her to third-party danger and/or rendered her more vulnerable to the risk of further abuse. Dkt. 116. In support of her position, Plaintiff argues that Defendant Morrison: "accepted an investigation he knew he was not qualified to perform," "failed to perform any meaningful investigation," "ignored Dr. Duralde's recommendation to 'fully investigate,'" "ignored DSHS policy by failing to perform a mandatory home study or participate in a shelter care hearing to determine if Ms. Wright and her brother should be placed in the home of the alleged abuser's mother," and "grossly misread the referral by ignoring its clear reference to allegations of substance abuse." Dkt. 116, at 25. These five allegations, if believed by jury, all amount to the state's failure to act as was the case in *DeShaney*. These omissions to act are simply not sufficient to prevail. *See DeShaney*. There was no affirmative state action: no involuntary exposure to harm as a result of a state actor's command. There is no state action which created or exposed Ms. Wright "to a danger which he or she would not have otherwise faced." *Kennedy* at 1061. None of the state created danger theory cases, cited by either party or that have been found to state a claim in the Ninth Circuit, include a case where the state's affirmative conduct was a failure to act.

      Plaintiff argues that Defendant Morrison created a more dangerous situation for her when he "lied about Wright 'follow[ing] the safety plan to the letter'" in his final report. Dkt. 116, at 25-26. Defendant Morrison contests Plaintiff's characterization, but, in any event, testified that Mr. Wright "cooperated fully with everything" that Mr. Morrison asked him to do. Dkt. 123, at 86. Even if this line in the final report was not true, Plaintiff has failed to show a causal connection between this line in the final report and her exposure "to a danger which he or she would not have otherwise faced." *Kennedy* at 1061.

      Plaintiff argues that Mr. Morrison created or exposed her to a danger she would not have faced when he: "interfered in a law enforcement investigation by placing the victim (Plaintiff) with the perpetrator's mother (Ms. Buckner)." Dkt. 116, at 25. Again, Plaintiff points to no evidence that Defendant Morrison made the decision to place her with her grandmother. He decided not to move Plaintiff after the Sumner Police Department released Plaintiff to her grandmother's care. There is no

ORDER
Page - 12

evidence that Plaintiff's father was abusing her while in the home of Ms. Buckner.  Plaintiff argues that Ms. Buckner was pressuring Plaintiff not to disclose the abuse she suffered at Ms. Buckner's son's hands.  There is no evidence in the record that Mr. Morrison knew Plaintiff was under pressure from her grandmother.  Defendant Morrison's failure to move Plaintiff to protect her from Ms. Buckner and Ms. Buckner's interference with the police investigation of her son may, arguably, amount to negligence, but did not place Plaintiff in a more dangerous circumstance than that in which he found her.  His inaction was like the social worker's inaction in *DeShaney* in leaving Joshua in the home of his abusive father.  Under the Supreme Court precedent of *DeShaney* this inaction does not constitute a violation of Plaintiff's due process rights.

ii.   Deliberately Indifferent to a Known or Obvious Danger

The next issue to be decided are the related issues of whether the danger to which Mr. Morrison purportedly exposed Plaintiff to was known or obvious, and whether he acted with deliberate indifference to it.  *Kennedy* at 1064.  The standard in the Ninth Circuit is "not gross negligence but 'deliberate indifference to a known, or so obvious as to imply knowledge of, danger.'" *Id.*, at 1064-65.

There is no evidence that Mr. Morrison acted to exposed Plaintiff to a "known or obvious danger."  Further, there is no evidence that he was deliberately indifferent, that is "knew of and disregarded an excessive risk" to Ms. Wright.  Defendant Morrison testified that he felt at that time that Ms. Buckner was "very caring," "protective," and "willing to provide for these children."  Dkt. 123, at 86.  Moreover, he did not think that Ms. Buckner "might not support the children being truthful during this investigation" even "knowing that if they told the truth her son might go to prison."  Dkt. 121-4, at 7.  He did not feel that Ms. Buckner would place the welfare of her son over that of the grandchildren.  Dkt. 123, at 86.  He also had Dr. Duralde's report who opined that Ms. Wright's "grandmother seems to be a very concerned and supportive care giver.  She seemed interested in maintaining the patient's safety."  Dkt. 103, at 8.  He testified that he was aware that Ms. Buckner took Plaintiff to Sumner the day before their first contact to find some of Plaintiff's friends to try to prove her son's innocence, but that he thought it was Ms. Wright's idea, and that after being told not to do it again, Ms. Buckner complied.  Even if Ms. Wright's version of events is true, and he failed to ask her whether she had been abused by her father, there is no

evidence Ms. Wright told Mr. Morrison that she had been abused. The evidence does not show that Mr. Morrison acted with "deliberate indifference" to a "known and obvious danger." *Kennedy* at 1064.

b.  *Special Relationship Exception*

The second exception to the general rule in *DeShaney* is the "special relationship" exception. *DeShaney* at 201. The special relationship arises from "the state's affirmative act of restraining the individual's freedom to act on his own behalf-through incarceration, institutionalization or other similar restraint of personal liberty." *Id.,* at 200. That is "the 'deprivation of liberty,' triggering the protections of the Due Process Clause . . . ." *Id.* The *DeShaney* Court noted, "[h]ad the State by the affirmative exercise of its power removed Joshua from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutitonalization to give rise to an affirmative duty to protect." *Id.,* at 201, n. 9. The Court noted several courts of appeals had held that there was a claim under the Due Process Clause against the state for "failing to protect children in foster homes from mistreatment at the hands of their foster parents." *Id.* The Supreme Court declined to reach the issue, and there is no Ninth Circuit precedent directly on point.

The Circuits appear to have come to varying conclusions. Some courts of appeals have held that "foster children have a substantive due process right to be free from harm at the hands of state-regulated foster parents." *Nicini v. Morra*, 212 F.3d 798 (3rd Cir. 2000); (*citing Lintz v. Skipski*, 25 F.3d 304, 305 (6th Cir.1994); *Norfleet v. Arkansas Dep't of Human Servs*., 989 F.2d 289, 293 (8th Cir.1993); *Yvonne L. v. New Mexico Dep't of Human Servs*., 959 F.2d 883, 891-93 (10th Cir.1992); *K.H. v. Morgan*, 914 F.2d 846, 848-49 (7th Cir.1990)) and *see Taylor By and Through Walker v. Ledbetter*, 818 F.2d 791 (11th Cir. 1987). The Third Circuit in *Nicini* held that the plaintiff child who was in state custody had a due process interest to be free from harm even though the people he was placed with were not state-regulated foster parents. *Id*. In contrast, in the Fourth Circuit, "harm suffered by a child at the hands of his foster parents is not harm inflicted by state agents" and so there is no due process violation. *Weller v. Department of Social Services for City of Baltimore*, 901 F.2d 387 (4th Cir. th 1990) (*citing Milburn v. Anne Arundel County Dep't of Social Servs*., 871 F.2d 474 (4th Cir.), *cert. denied*, 493 U.S. 850, (1989)). In *Weller* a child who was removed from his father's home and placed in relative care with his grandmother and then his mother. *Id.* The *Weller* Court noted that neither home was "operated by the state or its agents." *Id*.

The *Weller* Court noted that "harm suffered by a child in the custody of a parent or grandparent is not harm inflicted by the State," and so there was no due process violation. *Id.*

The conclusion of the majority of the is circuits persuasive: that children in foster care have a "special relationship" with the state such that they have a have a substantive due process right to be free from harm at the hands of state-regulated foster parents. The case here, however, is not so simple. Ms. Wright was not in foster care. The State of Washington did not have custody of her. At best, there are issues of fact as to whether she was in the "care of the state."

Assuming, for the sake of discussion, that Ms. Wright was in the "care of the state," the Court must then decide "what level of conduct is egregious enough to amount to a constitutional violation and, then, whether there is sufficient evidence that [Mr. Morrison's] conduct rose to that level." *Nicini v. Morra*, 212 F.3d 798 (3rd Cir. 2000). Some of the circuits have applied the same standard used to judge prisoner's constitutional claims that adequate medical care was not provided them and foster children's claims constitutional rights were violated when they were harmed by their foster parents. *See e.g. Taylor By and Through Walker v. Ledbetter*, 818 F.2d 791 (11th Cir. 1987). In the Ninth Circuit, a claim of failure to provide medical care for serious medical needs, when brought by a detainee who has neither been charged or convicted of a crime, is analyzed under the Due Process Clause of the Fourteenth Amendment. *Lolli v. County of Orange County*, 351 F.3d 410, 418-419 (9th Cir. 2003). Officials are liable if they are "deliberately indifferent" to a serious medical need. *Id.* The Ninth Circuit also uses the "deliberately indifferent" standard to judge a state official's conduct in the "state created danger exception" to *DeShaney's* general rule. *Johnson*, at 641. In the context of medical care for pretrial detainees,

> A defendant is liable for denying needed medical care only if he knows of and disregards an excessive risk to inmate health and safety. In order to know of the risk, it is not enough that the person merely be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, he must also draw that inference. But if a person is aware of a substantial risk of serious harm, a person may be liable for neglecting a prisoner's serious medical needs on the basis of either his action or inaction. Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment.

*Lolli*, at 419 (*internal quotations and citations omitted*).

Applying that standard here, there is no evidence that Mr. Morrison "knew of and disregarded an excessive risk" to Ms. Wright. As stated above in the analysis on the "state created danger" exception,

1 there is no evidence that Mr. Morrison acted with "deliberate indifference" to a known and obvious
2 danger. Plaintiff's "special relationship" exception claim should be dismissed.

3         2. *Clearly Established*?

4 Plaintiff has failed to show that there are issues of fact as to either prong of the "state created
5 danger" exception and so has failed to show that her Constitutional rights were violated. Accordingly, no
6 further analysis is helpful or required under *Saucier. Saucier*, at 201.

7 Even if the state had "special relationship" with Ms. Wright, and Mr. Morrison was deliberately
8 indifferent to the harm Ms. Wright suffered at the hands of Ms. Buckner, he is entitled to qualified
9 immunity if the right violated was not clearly established. *Saucier* at 202. As to the second inquiry in the
10 qualified immunity analysis, if the law did not put the official on notice that his conduct would be clearly
11 unlawful, summary judgment based on qualified immunity is appropriate. *Saucier* at 202. As stated
12 above, there is no Ninth Circuit precedent similar to this case. There are splits in the United States Circuit
13 Courts of Appeal. Even if Plaintiffs' constitutional rights were violated, Mr. Morrison is shielded by
14 qualified immunity from Plaintiffs' § 1983 claims. Defendant's Motion for Summary Judgment on
15 Plaintiffs' § 1983 claims should be granted and Plaintiffs' § 1983 claims should be dismissed.

16     **D.    STATE LAW CLAIMS AND POSSIBLE REMAND**

17 Pursuant to 28 U.S.C. § 1367(c), district courts may decline to exercise supplemental jurisdiction
18 over a state law claims if (1) the claims raise novel or complex issues of state law, (2) the state claims
19 substantially predominate over the claim which the district court has original jurisdiction, (3) the district
20 court has dismissed all claims over which it has original jurisdiction, (4) in exceptional circumstances,
21 there are other compelling reasons for declining jurisdiction. "While discretion to decline to exercise
22 supplemental jurisdiction over state law claims is triggered by the presence of one of the conditions in §
23 1367(c), it is informed by the values of economy, convenience, fairness, and comity." *Acri v. Varian*
24 *Associates, Inc*., 114 F.3d 999, 1001 (9th Cir. 1997)(*internal citations omitted*).

25 Here, two of the four conditions in § 1367(c) are present. As above, all Plaintiffs' federal claims
26 against Defendant Morrison are dismissed by this order. In light of this order, it appears unlikely that
27 federal claims against the state remain. Accordingly, this Court has "dismissed all claims over which it
28

has original jurisdiction," and so has discretion to decline to exercise supplemental jurisdiction over the state law claims under § 1367(c)(3).

Moreover, the remaining state claims "raise novel or complex issues of state law" under § 1367(c)(1). The values of economy and convenience may well be served by this Court's declining to exercise supplemental jurisdiction. *See Acri* at 1001. Because state courts have a strong interest in enforcing their own laws, *See Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 352 (1988), the value of comity is served by this Court declining jurisdiction. The value of fairness is also served by having the matter remanded.

Although "it is generally within a district court's discretion either to retain jurisdiction to adjudicate the pendent state claims or to remand them to state court," *Harrell v. 20th Ins. Co.*, 934 F.2d 203, 205 (9th Cir. 1991) in the interest of fairness, the parties should be given an opportunity to be heard on whether the case should be remanded. Parties should be ordered to show cause why the remaining state law claims should not be remanded to Pierce County Superior Court. Parties' briefs, if any, are due July 30, 2010. Parties briefs should not exceed five pages. Consideration of the parties' responses to the order to show cause, if any, should be noted for July 30, 2010.

### III. ORDER

Accordingly, it is hereby **ORDERED** that:

- Defendants' motion to strike any comment by Plaintiff's standard of care experts Katherine Kent and Jane Ramon that Defendant Bruce Morrison's conduct was "deliberately indifferent" (Dkt. 122) is **GRANTED**; those comments are **STRICKEN**;
- Defendants' Motion for Partial Summary Judgment Re: 42 U.S.C. § 1983 Claims (Dkt. 102) is **GRANTED**;
- Plaintiff's Substantive Due Process, Procedural Due Process, and Equal Protection claims are **DISMISSED**; and
- Parties are **ORDERED TO SHOW CAUSE,** if any they have, why this matter should not be remanded to Pierce County, Washington Superior Court; briefs, if any, shall not exceed five pages and shall be filed by **JULY 30, 2010**;

- Consideration of the parties' responses to the order to show cause, if any, shall be noted for **JULY 30, 2010**.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

DATED this 9th day of July, 2010.

*Robert J. Bryan*
Robert J. Bryan
United States District Judge

ORDER
Page - 18